IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-00308-WYD-CBS

SOLEDAD BALTAZAR,

     Plaintiff,

v.

ERIC K. SHINSEKI, Secretary, United States Department of Veterans Affairs,

     Defendant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

     THIS MATTER is before the Court on Defendant's Motion for Summary

Judgment (ECF No. 39) filed December 20, 2010.  A response in opposition to the

motion was filed on January 24, 2011, and a reply brief was filed on February 18, 2011.

On March 4, 2011, I granted Plaintiff leave to file an Amended Response and accepted

the document for filing.  On March 23, 2011, I also granted Defendant leave to file an

Amended Reply and accepted the document for filing.  After carefully considering the

Motion, Amended Response and Amended Reply, I find that the Motion for Summary

Judgment should be granted in its entirety.

II.    <u>BACKGROUND / RELEVANT FACTS</u>

     <u>Baltazar's Appointment at Eastern Colorado Health Care System</u>

     During the times relevant to the Amended Complaint, Plaintiff Baltazar

("Baltazar") was employed as a Registered Nurse by the Department of Veterans

Affairs, Eastern Colorado Health Care System ("ECHCS").  Baltazar was hired by the

ECHCS in 2003 as a temporary appointment.  At the time of her hiring, Baltazar did not

qualify for a permanent appointment because she was not a United States citizen.

Baltazar's temporary appointment was extended each year, until her termination in April

2008.

On June 1, 2003, Baltazar began working at ECHCS as a staff nurse.  She was

initially assigned to the hospital's telemetry unit, which is known as "Five North."  As a

staff nurse on Five North, Baltazar performed direct patient care.  Direct patient care

requires the ability to lift because a patient may need to be picked up or turned over.

Over the course of her employment at ECHCS, Baltazar was temporarily placed

on "work restrictions" or "light duty" on various occasions due to injuries.  In order to

accommodate her work restrictions, Baltazar was assigned different temporary duties

including organizing the supply room, training to be a charge nurse, working in the

management office, working in the recruiting office, and working as a discharge planner.

In October 2007, Baltazar went on two months of maternity leave after the birth

of her third child.  On December 27, 2007, Baltazar returned to work at ECHCS.  At this

time, Johnna Greeley was the nurse manager on Five North and was Baltazar's direct

supervisor.  Alesia Coe was the Associate Director of Nursing Services and was

Baltazar's second line supervisor.  Upon returning to work, Baltazar had a 30-pound

maximum lifting restriction due to a prior back injury.  In order to accommodate the

lifting restriction, Baltazar was assigned to a charge nurse position on Five North in the

main hospital in Denver.  As a charge nurse, Baltazar oversaw the staff nurses on her

shift and was responsible for making assignments and coordinating the movement of patients. Greeley received feedback from nurses on the floor, nursing supervisors, and Baltazar herself that Baltazar was overwhelmed in the charge nurse position.

At this time, Melody Ramos was a nursing supervisor who worked the evening shift. Ramos reported to Greeley several concerns about Baltazar's performance as a charge nurse. Ramos also sent an email to Coe to document her observations of Baltazar's performance. Also at this time, Patricia Barrow was a nursing supervisor on the evening shift. Barrow also reported concerns to Greeley about Baltazar's performance as a charge nurse. Specifically, Barrow reported that Baltazar was not coordinating the movement of patients, as required in her role as a charge nurse. Barrow documented her concerns regarding Baltazar's performance in a hand written memo to Coe. Greeley reported these concerns about Baltazar's performance to Coe.

In January 2008, Baltazar informed Greeley that she no longer wanted to work in the charge nurse position. Coe then searched for another available position that would fit Baltazar's light duty requirements. Coe determined that the Lakewood community based outpatient clinic had a need for a registered nurse and that the position would accommodate Baltazar's lifting restriction. The Lakewood Clinic is an off-site outpatient clinic, located in Lakewood, Colorado.

On January 29, 2008, Baltazar wrote a letter to Judy Burke, Senior Associate Director of Nursing Services, requesting employment at a closer location as the Lakewood Clinic is approximately 25 miles from her home. On January 30, 2008, Baltazar wrote a similar letter to Coe requesting to be assigned employment at a

different location.  At no time in these letters did Baltazar claim that her assignment at

the Lakewood Clinic was due to discrimination or retaliation.  On January 31, 2008,

Baltazar began working at the Lakewood Clinic.  Baltzar's job duties at the Lakewood

Clinic included telephone triage, seeing walk-in patients, lab draws, and taking EKGs.

At that time, Valerie Owens was the nurse manager of the ambulatory clinics, including

the Lakewood Clinic.

On February 26, 2008, Baltazar was evaluated by Dr. Lesnak, one of her treating

physicians, for her back injury.  Baltazar complained to Dr. Lesnak that she felt her drive

to the Lakewood Clinic was too far.  Dr. Lesnak refused to order any driving restrictions,

however, he did recommend "no continuous sitting activities for more than one to two

hours at a time."  (Def.'s Mot., Ex. B at 88:19-89:6, ECF No. 39.)  On March 10, 2008,

approximately ten days after Dr. Lesnak's evaluation, Baltazar was reassigned to the

Aurora Clinic, which was closer to Baltazar's home.

On or about March 10, 2008, Baltazar began working at the Aurora Clinic.  One

of her job duties was to perform telephone triage.  Telephone triage is a process in

which a nurse gathers information from a patient over the telephone in order to identify

specific symptoms and determine the appropriate course of action.  At this time, Martha

Weeks was the charge nurse at the Aurora Clinic.  Weeks reported concerns to Owens

about Baltazar's work performance at the Aurora Clinic.  Specifically, Weeks reported

that Baltazar inappropriately released a patient prior to the provider reviewing the

patient's EKG and that Baltazar was not properly triaging patient calls.  Upon receiving

the feedback from Weeks, Owens reviewed some of Baltazar's telephone triage

records.  Owens reported her concerns about Baltazar's performance to Owens' supervisor, Dr. Eric Rogers.  Rogers instructed Owens to report the performance concerns to Coe, as Coe was still Baltazar's permanent manager.

Coe asserts that upon learning of Baltazar's performance deficiencies at the Aurora Clinic, Coe made the decision to terminate Baltazar's temporary appointment. On April 30, 3008, Baltazar was notified that her temporary appointment was being terminated, effective May 14, 2008.  Coe terminated Baltazar's appointment because of the feedback she had received from Ramos, Barrows, Greeley, Owens, and Weeks regarding Baltazar's performance deficiencies on Five North and at both the outpatient clinics.  In response, Baltazar claims that Coe terminated her appointment due to her ethnicity, Filipino accent, disabilities, and in retaliation for an Equal Employment Opportunity ("EEO") complaint Baltazar alleges that she filed in late January, 2008.

EEO Contact

Baltazar maintains that she filed EEO complaints in both 2006 and January 2008. Defendant disputes this.  Baltazar avers that after she was assigned to the Lakewood Clinic, she filed a written complaint of discrimination with the EEO in January, 2008. Baltazar alleged discrimination related to the need for an accommodation for her physical restrictions.  Baltazar maintains that she submitted this complaint to Vernell Rhodes, the director of the EEO office.  Baltazar goes on to state that she spoke with Rhodes to check on the status of her EEO complaint and Rhodes assured her that Rhodes talked to Baltazar's managing officials, including Coe, about the complaint. Thus, Baltazar believed her managers knew about the EEO complaint.  She also stated

that she spoke with Coe about her specific complaints.  Baltazar also claims that on

February 25, 2008, she reported to the EEO office that Dr. Rodgers told her to pull her

car over for a brief period of time when her commuting time to the Lakewood Clinic

exceeded her sitting limitation.

In response, Defendant states that it had no knowledge of or any record of any

EEO complaints by Baltazar prior to the complaint she initiated after her termination in

June 2008.  In support of its argument, the Defendant also submitted a declaration of

Michael Thomas, the EEO Manager at the ECHCS.  (Def.'s Mot., Ex. P, ECF No. 39.)

Thomas explained that all contact with the EEO office is documented in the Complaints

Automated Tracking System ("CATS").  Thomas performed a search of CATS, which

revealed that the only EEO contract by Baltazar was her contact in June 2008 following

her termination.  (Def.'s Mot., Ex. P, ECF No. 39.)

It is undisputed that on June 12, 2008, Baltazar made contact with an EEO

counselor.  On September 19, 2008, Baltazar filed an EEO complaint alleging that her

termination from ECHCS was due to discrimination on the basis of disability, national

origin, gender, race, and reprisal.

<u>Wrist Injury</u>

In 2005, Baltazar injured her right wrist when a patient grabbed her.  She was

temporarily placed on light duty due to her wrist injury.  In 2006, Baltazar had surgery on

her wrist and was eventually returned to full duty in June 2006 by her treating physician,

Dr. Marc Steinmetz.  Dr. Steinmetz did not recommend any work restrictions or

limitations.  Dr. Steinmetz testified that Baltazar has normal range of motion in her right

wrist and that the grip strength in her right hand is average.  Baltazar testified that, due

to her prior wrist injury, it is painful for her to perform continuous handwriting.  She also

has difficulty opening lids on jars, playing the piano, making artistic renderings,

chopping some foods, and bracing herself with her wrist.

Back Injury

Baltazar's most recent back injury occurred in January 2007 when she was lifting

a patient.  Dr. Steinmetz treated her for this injury.  Dr. Steinmetz initially placed

Baltazar on a 10-pound restriction for "lifting, repetitive lifting, carrying, pushing and

pulling" and advised that she alternate between sitting and standing "as needed."

(Def.'s Mot., Ex. Q at 53:19-24, ECF No. 39.)  Over the course of the next several

months, between February 2007 and July 2007, Dr. Steinmetz placed Baltazar on lifting

restrictions varying between 10 and 25 pounds, and sometimes included the

recommendation that she alternate between sitting and standing "as needed."  (Def.'s

Mot., Ex. Q at 57:9-14, 57:22-58:6, 58:7-25, 59:10-19, 60:13-19, 63:10-17, 64:14-19,

65:2-9, ECF No. 39.)  During this timeframe, Baltazar was also pregnant.  In November

2008, Dr. Steinmetz placed Baltazar on a permanent lifting restriction of 30-pounds for

"lifting, repetitive lifting, carrying, pushing and pulling."  (Def.'s Mot., Ex. Q at 88:7-89:7;

90:20-91:10, ECF No. 39.)

Depression

In her Amended Complaint, Baltazar alleges depression as a qualifying disability.

However, Baltazar failed to identify depression as her disability in her formal EEO

complaint or when interviewed by the EEO investigator.  Baltazar also admits that

during the almost five years that she worked at the ECHCS, she never sought any psychiatric or psychological treatment.  In 2005, however, Baltazar's primary care doctor did prescribe Prozac for postpartum depression.  The Prozac alleviated Baltazar's symptoms of depression, and Baltazar stopped taking the medication after several months because she was no longer experiencing symptoms of depression.  Baltazar admits that she did not take any medication for depression at any other time during her employment with the ECHCS.

III.   STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Employment Opportunity Comm'n. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "When applying this standard, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

IV.   <u>ANALYSIS</u>

A.   <u>Whether Baltazar Properly Exhausted her Claims with the EEO</u>

Plaintiffs who allege discrimination by an executive agency, as defined in

5 U.S.C. § 105 to include executive departments, must first consult with an EEO

counselor "prior to filing a complaint in order to try to informally resolve the matter."

29 C.F.R. § 1614.105(a).  Contact must be initiated with the EEO counselor "within 45

days of the date of the matter alleged to be discriminatory."  *Id.* § 1614.105(a)(1).  This

and other deadlines have been construed as statutes of limitations and are thus, subject

to waiver, estoppel, and equitable tolling.  *See Beene v. Delaney*, 70 F.App'x 486, 490-

91 (10th Cir. June 27, 2003); *see Hanlen v. Henderson*, 215 F.3d 1336, 2000 WL

628205, at *3 (10th Cir. May 16, 2000) (addressing the 45-day deadline).

Moreover, in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the

Supreme Court clarified that contact with an EEO counselor is required within 45 days

of each discrete discriminatory action and that "[e]ach incident of discrimination and

each retaliatory adverse employment decision constitutes a separate actionable

unlawful employment practice."  *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir.

2003) (citing *Morgan*, 536 U.S. at 114) (internal quotation marks omitted).

Defendant argues that Baltazar's claims are limited to the single issue she

exhausted—the termination of her temporary appointment at ECHCS—because

Baltazar did not contact an EEO counselor within forty-five days of any other alleged

discriminatory incident.  Defendant claims that Baltazar first made contact with an EEO

counselor on June 12, 2008, thus, any claims based on the denial of a reasonable

accommodation, hostile work environment, or retaliatory action prior to April 28, 2008

are time barred.  In response, Baltazar states that she filed two EEO complaints (in both

2006 and in January of 2008) prior to contacting the EEO on June 12, 2008.

Specifically, after she was assigned to the Lakewood Clinic, Baltazar claims that she

filed a written complaint of discrimination with the EEO in January, 2008.  She states

that she submitted this complaint to Vernell Rhodes, the director of the EEO office.

Baltazar goes on to assert that she spoke with Rhodes to check on the status of her

January, 2008 EEO complaint.

     However, Baltazar's only evidence in support of her argument is her own

conclusory and self-serving statements in her affidavit.  Defendant, on the other hand,

submitted ample evidence in the form of (1) sworn deposition testimony by several

witnesses who averred that they had no knowledge of any EEO complaints or contact

prior to Baltazar's termination and (2) a sworn declaration by the EEO manager who

stated that there is no record of any EEO complaints or contact by Baltazar prior to her

termination.  Accordingly, I find Baltazar's self-serving statements insufficient to

demonstrate the existence of a disputed fact as to whether Baltazar filed an EEO

complaint or made contact with an EEO counselor prior to June 12, 2008.  *Thomas v.*

*U.S. Bureau of Prisons*, 282 Fed. Appx. 701, 704 (10th Cir. 2008) (holding that

conclusory and self-serving statements even if presented in an affidavit, are insufficient

to create a genuine issue of fact to survive summary judgment).  Thus, Baltazar cannot

meet her burden of establishing exhaustion of any alleged incident other than the

termination of her appointment on April 30, 2008.  It is undisputed that Baltazar made

contact with an EEO counselor on June 12, 2008, thus, any claims based on any

alleged discriminatory action occurring prior to April 28, 2008 (denial of a reasonable

accommodation, hostile work environment, or retaliatory action) are barred as untimely

and unexhausted.[1]

> B.   Whether Summary Judgment is Proper on Baltazar's Discrimination Claim
>       Under the Rehabilitation Act

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be . . . subjected to

discrimination under any program or activity . . . conducted by any Executive agency

---

[1] I note that in her response, Baltazar attempts to put forth a copy of an EEO complaint, claiming that she gave the document to Vernell Rhodes on January 30, 2007. However, Baltazar failed to produce this document in discovery. Defendant argues that she should not be permitted to use the document as evidence in support of her claims. I agree. When a party fails to disclose the information required by Fed. R. Civ. P. 26(a), that party is not allowed to use the information or witness to supply evidence on a motion, "unless the failure was substantially justified or is harmless." Fed. Civ. P. 37(c)(1), *Kern River Gas Transmission Co. v. 6.17 Acres of Land*, 156 F. App'x 96, 101-02 (10th Cir. 2005) (affirming district court's Rule 37 sanction preventing party from introducing documents not produced during discovery). The rule leaves me with the discretion to determine whether Baltazar's omission was substantially justified or harmless. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 992-93 (10th Cir. 1999); *Orjias v. Stevenson*, 31 F.3d 995, 1005 (10th Cir. 1994). "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Woodworker's Supply, Inc.*, 170 F.3d at 992-93 (internal citation omitted). I find that Baltazar's failure to disclose this alleged EEO complaint prejudiced the Defendant as it was requested several times in discovery. (Def.'s Reply, Ex. T, ECF No. 67.) I further find that since discovery is closed and briefing on the summary judgment motion complete, Baltazar's late disclosure cannot be cured. Thus, I will not consider this document in connection with the pending motion. However, even if I were to consider this evidence in connection with this motion, I find that it is not critical to my analysis. Even with the copy of the alleged EEO complaint, I find that Baltazar has failed to offer sufficient evidence to create a genuine issue of fact as to whether she contacted the EEO in January of 2007. See *Thomas*, 282 F. App'x at 704. Moreover, as I previously stated, Defendant submitted ample evidence to the contrary.

. . . ." 29 U.S.C. § 794.  The statute confers a private right of action to "qualified

individuals who have been subjected to discrimination by the federal government or by

a program or activity receiving federal financial assistance." *McGeshick v. Principi*, 357

F.3d 1146, 1149 (10th Cir. 2004) (internal citations omitted).  In order to establish a

prima facie case of employment discrimination under the Rehabilitation Act, a plaintiff

must show the following: "(1) that the plaintiff is disabled under the Act; (2) that he [or

she] would be otherwise qualified to participate in the program; (3) that the program

receives federal financial assistance (or is a federal agency); and (4) that the program

has discriminated against the plaintiff." *Id.* at 1150 (internal quotation marks omitted).

### 1.   Whether Baltazar is Disabled Under the Act

In this case, Baltazar alleges that she suffers from three physical conditions: (1)

severe depression; (2) a permanent back injury; and (3) a wrist injury.  As a result of

these conditions, Baltazar maintains that she is disabled in the major life activities of

both lifting and working.

As an initial matter, Defendant argues that Baltazar is barred from claiming

depression as a basis of disability because she failed to administratively exhaust that

claim.  I agree.  A plaintiff must exhaust her administrative remedies before pursuing a

Rehabilitation Act claim in federal court.  *See Khader v. Aspin*, 1 F.3d 968, 970 (10th

Cir. 1993).  Exhaustion of administrative remedies is central to the Rehabilitation Act

because it provides "the agency the information it needs to investigate and resolve the

dispute between the employee and the employer.  Good faith effort by the employee to

cooperate with the agency and the EEOC and to provide all relevant, available

information is all that exhaustion requires." *Id.*

Here, in her EEO complaint, Baltazar specifically alleged disabilities based on injuries to her back and upper extremities.  Additionally, when asked during her EEO interview to identify her disability, Baltazar responded that she has both a wrist and back injury.  Baltazar did not mention depression as a disability until she filed this lawsuit.  Moreover, Baltazar has not presented any evidence to the contrary in connection with this motion.  Thus, based on my review of the relevant evidence, I find that Baltazar did not exhaust her claim that she is disabled due to severe depression.  Thus, Baltazar is barred from claiming depression as a basis for disability.

a.   <u>Major Life Activity of Lifting</u>

The first factor under the Rehabilitation Act is that the plaintiff must have a disability.  The Rehabilitation Act defines the term "disability" to mean any of the following: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(2); *see also* EEOC Interpretive Guidelines for the Rehabilitation Act, 29 C.F.R. § 1614.203(b).

A person is substantially limited in a major life activity if he or she is "unable to perform the activity or [is] significantly restricted in the ability to perform the major life activity compared to the general population."  *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001).  In determining whether an individual is "substantially limited," the factfinder must consider three factors: "(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the

-13-

permanent or long term impact resulting from the impairment." *Id.*

Baltazar attempts to show she is disabled under the ADA because she has a 30-pound lifting restriction. Baltazar asserts that the "aggregate" of her restrictions on lifting, sitting, bending, squatting, standing, walking, sleeping, painting, writing, and slicing vegetables demonstrate that "her lifting restriction is severe and should not require comparator evidence." (Pl.'s Resp at 44, ECF No. 62.) Without more, I find that these statements are insufficient because they fail to provide the factfinder with any information to use in considering the three *Lusk* factors.[2] In fact, these assertions provide no information that a jury could use to decide for themselves whether or not Baltazar is substantially limited in the claimed activities.[3]

b.   <u>Major Life Activity of Working</u>

Baltazar also claims that she is substantially limited in the major life activity of working. However, I agree with Defendant that Baltazar failed to administratively exhaust this claim. See *Khader,* 1 F.3d 968, 970-71 (10th Cir. 1993) (holding that exhaustion of administrative remedies is a jurisdictional prerequisite in a Rehabilitation Act case). In her EEO complaint, Baltazar alleged disabilities based on physical

---

[2] I note that in *Lusk*, the Tenth Circuit held that a plaintiff could not survive summary judgment because, although he established that he could not lift more than forty pounds, he failed to produce "any comparative evidence as to the general population's lifting capacities." *Lusk*, 238 F.3d at 1241.

[3] Baltazar relies on *Dilley v. SuperValu, Inc.*, 296 F.3d 958 (10th Cir. 2002) in support of her argument that a 60-pound lifting restriction can be substantially limiting on its face. However, I find that this case is distinguishable to the case at hand. In *Dilley*, the Court found that the district court did not commit plain error by allowing the truck driver's claim to go to the jury because the case "turn[ed] on working as a major life activity, not lifting." *Id.* (internal quotation marks omitted).

injuries to both her back and upper extremities.  (Def.'s Mot. Ex. P Attachment C, ECF

No. 39.)  Moreover, in her EEO interview, Baltazar identified her disability as a wrist and

back injury with no mention of any impairment in her ability to work in a broad class of

jobs.  (Def.'s Mot., Ex. P Attachment C, ECF No. 39.)  In fact, in her Amended

Complaint, Baltazar asserts that she was able to perform her job adequately at all

relevant times with or without reasonable accommodations.  She also stated that there

were many jobs in the hospital she could perform despite her lifting restrictions.  (Am.

Compl. at 8, ECF. No. 6.)   Based on my review of the evidence, Baltazar has not

presented any evidence to the contrary.  Thus, I find that Baltazar failed to

administratively exhaust and plead an alleged impairment to the major life activity of

working.  Consequently, she is barred from pursuing a claimed disability on this basis.

Accordingly, Baltazar has failed to provide evidence to create a genuine issue of

fact that satisfies the first factor under the Rehabilitation Act.  She has not shown that

she has a physical or mental impairment that substantially limits one or more of her

major life activities.  Therefore, summary judgment is granted as to Baltazar's

discrimination claim under the Rehabilitation Act.

C.     Whether Summary Judgment is Proper on Baltazar's Discrimination Claim
        Under Title VII

Baltazar also brings discrimination claims of disparate treatment and hostile work

environment under Title VII based on her race, Asian, and her National Origin, Filipino.

Title VII makes it unlawful for an employer to "discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)

(1982). Here, I find that there is no direct evidence of employment discrimination, thus

the three-step *McDonnell Douglas* burden shifting analysis applies. *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, a plaintiff bears

the initial burden of presenting a prima facie case of discrimination. *Kendrick v. Penske*

*Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

      1.   <u>Termination</u>

To establish a prima facie case of discrimination resulting in wrongful termination,

a plaintiff must show (1) she was a member of a protected class; (2) she was qualified

for her job; (3) she was terminated despite her qualifications; and (4) she was

terminated under circumstances giving rise to an inference of unlawful discrimination.

*Swackhammer v. Sprint/United Magmt. Co.*, 493 F.3d 1160, 1166 (10th Cir. 2007). If

the plaintiff meets the prima facie case, the burden shifts to defendant to articulate a

legitimate, non-discriminatory reason for its employment decision. If defendant presents

a nondiscriminatory reason for its action, "summary judgment is appropriate unless the

employee can show there is a genuine issue of material fact as to whether the proffered

reasons are pretextual" so as to allow an inference that the employer did not act for the

offered nondiscriminatory reasons. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir.

2005) (citing *Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000)).

Here, it appears that the parties agree that Baltazar has met the first three

elements of a prima facie case of discrimination under the *McDonnell Douglas*

framework. Defendant, however, argues that Baltazar cannot meet the fourth

element—there is no evidence of circumstances giving rise to an inference of unlawful discrimination on the basis of Baltazar's race or national origin.

In response, Baltazar argues that she can prove discrimination by both direct and indirect evidence.  I disagree.  Baltazar asserts that Weeks disciplined her for having an accent.  However, I find that there is no evidence that Baltazar was disciplined, rather, Weeks merely noted in her summary of Baltazar's orientation at the Aurora clinic that Baltazar "need[s] improvement with her communication skills secondary to language and accent to assure understanding by others."  (Def.'s Mot., Ex. L at Attachment A, ECF No. 39.)  Further, this notation by Weeks was just one among numerous other statements identifying areas of needed improvement in Baltazar's employment performance.  (Def.'s Mot., Ex. L at Attachment A, ECF No. 39.)  Also, Weeks' comment about Baltazar's accent was made in the context of the evaluation of Baltazar's communication skills and the concern that patients calling into the Aurora clinic must be able to understand Baltazar as she was nurse conducting telephone triage.  *See Jiminez v. Mary Washington College*, 57 F.3d 369, 380 (4th Cir. 1995) (finding that references to audience difficulty in understanding may reasonably be interpreted as expressing a concern about ability to communicate rather than based on ethnicity or accent); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991) (holding that "[u]nlawful discrimination does not occur, however, when a plaintiff's accent affects his ability to perform the job effectively.")

Moreover, the evidence shows that Coe, not Weeks, made the decision to terminate Baltazar's appointment.  Thus, even if Baltazar could show that Weeks had a

discriminatory animus, which I find she cannot, she has failed to show that Coe shared the same discriminatory animus.  Coe considered Weeks' orientation summary along with negative feedback about Baltazar's employment performance from Ramos, Barrow, Greeley and Owens in making her decision to terminate Baltazar's appointment. Accordingly, I find that no reasonable fact finder could conclude that Week's lone statement about Baltazar's accent in the orientation summary supports an inference that Baltazar's termination was due to discrimination.

Baltazar also argues that "[t]here is evidence all her managers knew she was to become a citizen at the time of her termination."  (Pl.'s Resp. at 54, ECF No. 62.) Baltazar fails to cite to any evidence or authority for this assertion.  Moreover, I find that mere knowledge that Baltazar was a non-citizen is insufficient to create a genuine issue of fact as to establishing a discriminatory animus.

Finally, Baltazar claims that "Coe testified that she considered Ms. Baltazar's accent and national origin when she terminated her."  (Pl.'s Resp. at 55, ECF No. 62.) After reviewing the relevant testimony, I find that Baltazar's mischaracterizes Coe's statements.  Baltazar cites to a portion of Coe's deposition testimony in which Coe acknowledges that Baltazar's communication problems may have stemmed from a language barrier.  (Def.'s Reply, Ex. D at 112:23-113:16, ECF No. 67.)  However, contrary to Baltazar's assertions, Coe was not testifying about her reasons for terminating Baltazar's appointment.  Coe unequivocally testified that she terminated Baltazar's appointment due to repeated performance deficiencies. (Def.'s Reply, Ex. D at 50:14-17; Ex. H at 33:5-17, ECF No. 67.)  Thus, I find that Baltazar failed to provide

any credible evidence that Coe considered Baltazar's national origin in making the termination decision.

### 2.   Hostile Work Environment

"Although Title VII does not explicitly mention hostile work environment, a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII." *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000).  To survive summary judgment on a claim alleging a racially hostile work environment, a plaintiff must set forth evidence to show that "a rational jury could find that the work place is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Herera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  She must also show that she was "targeted for harassment" because of discriminatory animus. *Id.*

In connection with this claim, Baltazar argues that "from December 27, 2007 until April 30, 2008 Defendants [sic] engaged in a continuing violation of not giving [her] orientation . . ." (Pl.'s Resp. at 43, ECF No. 62.)  Given the law set forth above, I do not find that Baltazar's allegations that she was denied proper "orientation" amount to a hostile work environment.  Baltazar fails to cite any authority that a denial of training constitutes the abusive working environment that falls within the ambit of a racially hostile work environment.  Additionally, Baltazar fails to put forth any evidence that this alleged failure to provide "orientation" was motivated by racial animus.  Accordingly, Baltazar has failed to carry her initial burden of presenting a prima facie case of

discrimination.  Thus, summary judgment is proper on Baltazar's claim of discrimination under Title VII.

      D.    <u>Whether Summary Judgment is Proper on Baltazar's Retaliation Claim Under Title VII</u>

Baltazar's final claim is that the Defendant retaliated against her because she filed prior EEO complaints.  Because Baltazar again relies on circumstantial evidence in support of her retaliation claim, it is subject to the three-step *McDonnell Douglas* burden shifting analysis.  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that a genuine issue of fact exists as to each of the following elements: "(1) [s]he engaged in protected opposition to discrimination; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action."  *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001); *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1202 (10th Cir. 2006).

After a plaintiff makes a prima facie showing, a defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  Plaintiff must respond by demonstrating a defendant's asserted reasons for the adverse action are pretextual.  *Id.*  "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed by adverse action."  *Haynes v. Level Three Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (internal quotation marks omitted).

Here, Defendant submitted a declaration of the EEO Program Manager, Michael

Thomas, that states that EEO complaints are tracked in a database.  (Def.'s Mot.,

Thomas Decl., Ex. P at 2 ¶ 8, ECF No. 39.)  Thomas' search of the database revealed

that the only EEO complaint filed by Baltazar is the complaint she filed in June 2008

following her termination.  (Def.'s Mot., Thomas Decl., Ex. P at 2 ¶ 8, ECF No. 39.)  As I

previously stated, I find that Baltazar has offered no admissible evidence, besides her

own self-serving affidavit, to support her claim that she filed a complaint of

discrimination with the EEO office on January 30, 2008.  See *Thomas*, 282 F. App'x at

704.

Moreover, even if Baltazar could establish that she filed an EEO complaint on

January 30, 2008, she cannot show a causal connection between that action and her

termination on April 30, 2008.  "[I]n order to establish a causal connection between the

protected opposition and the adverse employment action, the employee's superior must

have knowledge that he or she is engaging in such protected opposition."  *Dean v.

Computer Scis. Corp.*, 384 F. App'x. 831, 838- 39 (10th Cir. 2010).  Here, Coe testified

that she was not aware of any prior EEO contact by Baltazar.  (Def.'s Mot., Ex. D at

148:15-20, ECF No. 39.)

I also find Baltazar's assertion that Coe was aware of the prior EEO complaint

because a conversation took place between Vernell Rhodes (the EEO manager at the

time) and Coe to be similarly unavailing.  The only evidence Baltazar offers in support of

this alleged conversation is her own self-serving affidavit which includes statements

purportedly made by Rhodes.  The alleged statements by Rhodes constitute

inadmissible hearsay and are insufficient to create a genuine issue of fact as to whether

Coe was aware of any prior EEO complaints. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (holding that when viewing a summary judgment affidavit, hearsay is inadmissible and will not be considered as it would not create a genuine issue of material fact at trial).

I further reject Baltazar claims that she told Owens about her alleged January 2008 EEO complaint. (Pl.'s Resp. at 55, ECF No. 62.) Again, the only evidence in support of this claim is Baltazar's own self-serving affidavit. *See Thomas*, 282 Fed. Appx. at 704. Here, Owens testified that she had no knowledge of any EEO contact by Baltazar. (Def.'s Mot., Ex. K at 14:12-14, ECF No. 39.) However, even if Owens was aware of the alleged January 2008 EEO contact, there is no evidence that Coe, as the sole decision-maker in Baltazar's termination, had this same knowledge. Baltazar's retaliation argument is also discredited by virtue of the undisputed fact that Baltazar's request to transfer to the Aurora Clinic was granted in March 2008 -- two months after the alleged EEO contact. (Def.'s Mot. at 13-14, ¶¶ 65, 78, ECF No. 39.) If Coe had a retaliatory intent upon learning of the alleged EEO contact, it is illogical that she would then grant Baltazar's request to transfer to the Aurora Clinic. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) ("same actor" evidence gives rise to an inference that no discriminatory animus motivated the employer's actions).

Finally, Baltazar cannot establish a causal connection through temporal proximity. Here, the three months between the alleged protected activity (January 30, 2008) and the termination decision (April 30, 2008) falls outside the outer boundaries of the temporal proximity test. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179

(10th Cir. 1999) (holding that while six weeks might be sufficiently close, three months is

not).  Accordingly, because Baltazar failed to establish a prima facie case of retaliation,

summary judgment is granted as to this claim.

V.      CONCLUSION

        Based on the foregoing, it is

        ORDERED that Defendant's Motion for Summary Judgment (ECF No. 39) is

**GRANTED** and Plaintiff's claims against the Defendant are **DISMISSED WITH**

**PREJUDICE**.  It is

        FURTHER ORDERED that in light of my rulings in this Order, both the final trial

preparation conference set for January 11, 2012 and the jury trial set for January 23,

2012 are **VACATED.**

        Dated:  July 1, 2011

                                        BY THE COURT:


                                        s/ Wiley Y. Daniel
                                        Wiley Y. Daniel
                                        Chief United States District Judge